# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs May 1, 2012

## DARNELL HUBBARD v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08051     Paula Skahan, Judge**

_____

**No. W2011-02037-CCA-R3-PC  - Filed July 20, 2012**

_____

A Shelby County jury convicted the Petitioner, Darnell Hubbard, of first degree murder, and he received a sentence of life without the possibility of parole. On appeal, this Court affirmed the Petitioner's conviction. *State v. Darnell Hubbard*, No. W2007-02482-CCA-R3-CD, 2009 WL 2568200, at *1 (Tenn. Crim. App., at Jackson, Aug. 20, 2009), *perm. app. denied* (Tenn. Nov. 23, 2009). The Petitioner filed a petition for post-conviction relief, asserting several claims of ineffective assistance of counsel and a claim that the State failed to disclose exculpatory evidence to the defense. After a hearing on the petition, the post-conviction court denied the petition. On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Sharon Fortner, Memphis, Tennessee, for the appellant, Darnell Hubbard.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and A. Brooks Irvine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

1

## A. Trial

This case arises from the murder of the victim, the Petitioner's wife, Lexie Hubbard. On direct appeal, our Court summarized the underlying facts of the case as follows:

In the early morning hours of June 12, 2006, the [Petitioner] stabbed Lexie Hubbard twelve times, killing her. At trial, the victim's fifteen-year-old daughter, Ashley Jones, testified that she arrived home around midnight and saw her eleven-year-old brother and the victim watching television together in the dining room. The victim's son and another daughter were asleep in their bedrooms, and the [Petitioner], "Ricky," was in the victim's bedroom. Jones went to bed. She was awakened by a crashing sound, and she heard the victim say, "No, Ricky, no. Don't do it; don't do it."

Jones rushed to her mother's bedroom and saw the [Petitioner] pull a nine-inch knife out of the victim's chest while the victim was "slouched" over on the floor. Jones yelled for her older brother, Demarlon Davis, and told him the [Petitioner] had stabbed their mother. Jones ran to the kitchen, obtained two knives, and gave them to Davis. The [Petitioner] emerged from the bedroom; swung the knife he had used to stab the victim at Jones, Davis, and others in the house; and ordered them to move. During the confrontation, the victim moved into Jones' bedroom and locked the door. The [Petitioner] grabbed the victim's keys and ran outside, and Davis chased him. Jones initially ran after Davis and the [Petitioner] but returned to the house because she was concerned about the victim. Before paramedics arrived, the victim was breathing hard and was in and out of consciousness. A firefighter at the scene informed Jones that the victim had died.

Jones testified that the victim wanted a divorce from the [Petitioner] so that she could marry someone else. Three days before the stabbing, the [Petitioner] called and left messages on the victim's cellular telephone. The victim let Jones listen to one of the messages in which the [Petitioner], in an angry voice, threatened to kill the victim. Jones said that the [Petitioner] had threatened to "get" her and her mother in the past. She said that the [Petitioner] often threatened and tried to fight with the victim when Jones' brothers were not around but that when the victim's sons were present it "would be a peaceful day." Jones recalled that the victim called the police a

few days before the stabbing because the [Petitioner] was trying to get into their home. The police came but told the victim that the [Petitioner] was allowed in the house because they were married.

Jones said that she occasionally cleaned her mother's room and that a few times she found a large knife from the kitchen knife set tucked under the mattress on the [Petitioner's] side of the bed. The knife the [Petitioner] used to kill the victim was one of the knives. Jones removed the knives she found in the victim's bedroom and hid them elsewhere because she was worried that the [Petitioner] was going to kill the victim.

Jones testified that a couple of years before the victim's death, she saw the [Petitioner] threaten to kill the victim with a knife. On that occasion, the [Petitioner] waited until everyone in the house was asleep. Jones awoke to see the [Petitioner] standing over the victim with a knife in his hand. The [Petitioner] threatened to kill the victim, but the victim and her children convinced him to leave instead. Jones also recalled another instance when she saw the [Petitioner] punch the victim, "busting" her lip.

The victim's son, Demarlon Davis, testified that on the night of the stabbing he heard the [Petitioner] urging the victim to go to bed. He also heard the [Petitioner] tell the victim that if he could not have her, nobody would. The victim told Davis that the [Petitioner] threatened to kill her and that she did not feel right with the [Petitioner] in the house. Davis offered to force the [Petitioner] to leave, but the victim declined and said that she was going to sleep. Davis went to bed and was awakened by his sister's screams. Davis said that upon hearing the screams, he "ran down toward like in [his] momma's room and [his] momma's whole gown was soaking wet with nothing but blood." The victim told him that she was "fixing to die" and that the [Petitioner] had stabbed her "a whole lot of times." Davis saw the [Petitioner] come out of the victim's bedroom with a knife. The [Petitioner] was "swinging" the knife at Davis and his daughter. Afterward, the [Petitioner] ran from the house. Davis chased the [Petitioner] until the [Petitioner] was apprehended by police.

Dr. Bruce Levy, the Chief Medical Examiner for the State of Tennessee, described the victim's multiple stab wounds. He said that the victim had twelve sharp force injuries. Ten wounds were described as "major stab wounds," and one pierced the right ventricle of the heart. The victim bled to death as the result of the injuries.

3

The victim's sister, Leslie Adams, testified about the [Petitioner's] relationship with the victim. She said that the victim and the [Petitioner] fought frequently and often lived apart. According to Adams, the victim moved to the home where she was living at the time of her death in order to get away from the [Petitioner]. When the victim lived at her previous residence, she asked Adams to stay with her at times when the [Petitioner] was at the residence because she was afraid of him. Adams never saw the [Petitioner] hit the victim, but, on one occasion, she saw him try to stab her. She said that on that occasion, the victim and [the Petitioner] were arguing over something petty and the [Petitioner] tried to stab the victim with a long kitchen knife. Adams said that she jumped between the [Petitioner] and the victim to prevent the stabbing.

Adams also testified regarding an altercation involving the [Petitioner] and the victim at their place of employment. Adams said the [Petitioner] had "whupped" the victim with a chair and poured bleach on her. Adams said that after the altercation, the victim left work and went to Adams' home. The victim was on her way to "press charges" against the [Petitioner]. The victim was very upset and was crying. The victim told Adams that "that ----, well, . . . you know, said in a violent way that he had done whupped on her jaw." Adams said that the [Petitioner] had knocked the victim's teeth out and that she was "all bruised up." The victim was "shaken" and said that she could not believe that the [Petitioner] "flipped" and "did this." Adams had heard the [Petitioner] threaten the victim many times and had heard him tell her that if he could not have her, nobody would. The victim told Adams that the only way the [Petitioner] would "get" her would be in her sleep.

Debora Coffman, a counselor with the Shelby County Citizen's Dispute, testified that she met with the victim on November 9, 2005, and helped the victim apply for an ex parte order of protection against the [Petitioner]. The victim told Coffman that she was afraid of the [Petitioner] because he had threatened to "get" her and because he had struck her with a chair and his fist in the past. Although an ex parte order of protection was issued, the case was dismissed a couple of weeks later because neither party showed up for the court hearing.

Memphis Police Department Sergeant Degrah Bell testified that she investigated the victim's domestic violence complaints against the [Petitioner]. In April 2002, the victim filled out a police report, alleging

4

that the [Petitioner] had attacked her with a metal chair while she was working. Sergeant Bell met with the victim. The victim was afraid and told Sergeant Bell that the [Petitioner] had attacked her because she had refused to give him a ride home. After a prosecutor determined that there was probable cause, Sergeant Bell prepared a warrant for aggravated assault against the [Petitioner]. In 2004, Sergeant Bell spoke with the victim by telephone to investigate another police report the victim had filed against the [Petitioner] alleging domestic violence. The victim told Sergeant Bell that the [Petitioner] attacked her physically and threatened to kill her with a knife and some bleach. The victim said that no further action was needed on the police report because the [Petitioner] had moved out of the home and she felt safe.

*Hubbard*, 2009 WL 2568200, at * 1-3.

After hearing the evidence, a Shelby County jury convicted the Petitioner of first degree murder of his wife, and he was sentenced to life without the possibility of parole.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, contending that his trial counsel was ineffective for: (1) failing to adequately communicate with the Petitioner; (2) failing to challenge a juror who knew the victim; and (3) failing to present mitigating factors at the sentencing hearing. The petition also asserted that the State had failed to disclose exculpatory evidence, depriving the Petitioner of his sixth amendment rights of "fundamental fairness" and a "fair and impartial trial." The post-conviction court held an evidentiary hearing, wherein it heard the following evidence: The Petitioner testified that the trial court appointed his counsel ("Counsel") to represent him at trial, and Counsel explained the State's evidence during the "two or three" meetings between them. The Petitioner testified that, other than these two or three face-to-face meetings, he had no additional communication with Counsel. He stated that he attempted to contact Counsel through letters, but Counsel never responded. The Petitioner testified that Counsel did not call witnesses on the Petitioner's behalf, such as the victim's ex-husbands or boyfriends. The Petitioner further stated that Counsel refused to call the Petitioner's sister as a witness because "she wouldn't be good for the case." He acknowledged that he knew that the victim's daughter and her sister would act as witnesses for the State. The Petitioner did not object to them acting as witnesses. The Petitioner also testified that it was his own choice not to testify, but he explained that he based this choice on his emotions, a promise to the victim's eldest daughter, and advice from Counsel.

5

The Petitioner also testified that Counsel represented him on his direct appeal of the case. On appeal, Counsel presented two issues: (1) the trial court erred by admitting evidence of prior acts of violence against the victim, including an ex parte order of protection; and (2) the trial court erred by admitting evidence regarding statements the victim made to her son and police officers.

On cross-examination, the Petitioner testified that Counsel discussed the case with him during courtroom hearings. The Petitioner stated that he could not recall discussing possible defenses with Counsel, but he acknowledged that he told Counsel "what had happened."

Counsel testified that he had practiced criminal defense with the Public Defender's Office since 1995 and had handled nine or ten murder cases in the past four or five years. He stated that, after voir dire, Counsel learned that one of the jurors knew the victim's sister, who was a witness for the State, because they had gone to the same high school. Counsel testified, however, that, after extensive individual questioning of the juror by the trial court, he "was satisfied that she could be nonbiased" and "believed she could be . . . fair and impartial." Counsel further stated that he "liked her or [he] wouldn't have left her on the jury."

Counsel testified that he could not put on proof at trial that the Petitioner "acted under strong provocation" because "[t]here was no proof in the record of that" and because the Petitioner refused to testify. Counsel stated that he asked the Petitioner whether he wanted to testify, informing him that, without the Petitioner's testimony, there existed no proof of strong provocation. Although the Petitioner had told Counsel that he acted in self-defense, the Petitioner decided not to testify, and, as a result, Counsel could not present that defense.

Counsel testified that he met with the Petitioner "two or three times in jail," but he also met with the Petitioner "a good eight or nine times" in court. Counsel said that he reviewed the case, discussed the possible defenses, and explained all of the evidence to the Petitioner. Counsel stated that the Petitioner "knew everything that they had against him." Counsel testified that he had called the Petitioner's sister and either his brother or an uncle to testify on the Petitioner's behalf at the sentencing hearing, but "[t]hey disappeared before the trial." Further, Counsel stated that the Petitioner's son arrived to testify at the sentencing hearing, but "[h]e showed up frankly so stoned he could hardly talk." Counsel told the Petitioner that they could still put the Petitioner's son on the stand to talk about the Petitioner's work ethic and responsibilities as a father, but the Petitioner told Counsel that he didn't "want him up there." As far as other witnesses, Counsel testified that the Petitioner did not mention any other witnesses he wanted Counsel to call,

6

either for trial or sentencing. Lastly, after the other witnesses had fallen through, Counsel again asked the Petitioner if he wanted to consider testifying at the sentencing hearing, but the Petitioner refused.

On cross-examination, Counsel stated that he did not engage in much negotiation with the State about a possible plea deal because the State wanted to either "try the case or let [the Petitioner] go life without parole." At the sentencing hearing, the victim's mother testified that she had forgiven the Petitioner, which Counsel stated that he tried to emphasize to the jury. Counsel testified that he asked the jury to forgive the Petitioner just as the victim's mother forgave him and "just give him life with the possibility of parole." Counsel stated that, although he handled more than a hundred cases in any given year, he always had adequate time to prepare for his cases.

Based upon this testimony, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner argues that the post-conviction court erred when it denied his petition for post-conviction relief because he received the ineffective assistance of counsel. He further argues that the State failed to disclose exculpatory evidence. The State argues that the post-conviction court properly found that the Petitioner did not prove his allegations by clear and convincing evidence, did not establish that he was prejudiced by any alleged deficiencies in Counsel's representation, and did not prove that the State withheld exculpatory evidence. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this Court,

with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

## A. Ineffective Assistance of Counsel

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945

S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In its order denying the Petitioner relief on this issue, the post-conviction court made the following findings:

> Petitioner did not overcome the presumption that . . . Counsel's actions could be legitimate trial strategy considering the particular circumstances of Petitioner's case. Additionally, Petitioner fails to articulate any specific failure on the part of . . . Counsel to support a claim of ineffective assistance of counsel. Petitioner fails to show how . . . Counsel's performance fell outside of the range of reasonable professional assistance and deprived the Petitioner of a fair trial. Therefore, this Court concludes that Petitioner has failed to prove by clear and convincing evidence that he was deprived of his constitutional right to effective assistance of counsel.

On appeal, the Petitioner specifically alleges that Counsel was ineffective for the following reasons: (1) he failed to communicate with the Petitioner; (2) he failed to challenge a juror who knew the victim and her family; and (3) he failed to present mitigating proof at the sentencing hearing. Regarding Counsel's communication with the Petitioner, the record shows that Counsel met with the Petitioner on several occasions, specifically two or three times in jail and nine or ten times in court; he consulted with the Petitioner regarding possible trial defenses; and he explained the evidence in the case to

the Petitioner. Further, after he realized that they had no proof to corroborate the Petitioner's defense of self-defense, Counsel repeatedly asked the Petitioner if he wanted to testify on his own behalf. Counsel explained that, without any testimony regarding the Petitioner's defense, he would not be able to present it to the jury. Accordingly, the evidence in the record does not preponderate against the post-conviction court's finding that the Petitioner failed to show by clear and convincing evidence that Counsel's performance was deficient or that the Petitioner was prejudiced as a result.

Regarding the Petitioner's second allegation of ineffective assistance of counsel, Counsel's failure to challenge a juror who knew the victim's sister, the record supports the post-conviction court's findings. Counsel requested an individual voir dire of the juror after he found out that the juror had gone to high school with the victim's sister. Counsel testified that the trial court held an individual voir dire of the juror and, after he heard the juror's answers to the trial court's questions, he "was satisfied that she could be nonbiased." Based on that observation, he decided not to challenge her position on the jury. Counsel testified that he "liked [the juror] or [he] wouldn't have left her on the jury." After questioning, Counsel made a strategic decision to allow the juror to remain on the jury. This Court notes that it is well established that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. As such, this Court will not disturb on appeal the post-conviction court's finding that the Petitioner was not deprived of effective assistance of counsel on this issue.

Lastly, the Petitioner argues that Counsel was ineffective because he failed to present mitigating proof at the sentencing hearing, leading to the jury's verdict that the Petitioner deserved a sentence of life without parole. Counsel testified that the Petitioner's sister and either his brother or an uncle planned to testify on the Petitioner's behalf at the sentencing hearing, but the two "disappeared before the trial." Counsel also stated that the Petitioner's son arrived to testify at the sentencing hearing, but "[h]e showed up . . . so stoned he could hardly talk." Counsel told the Petitioner that they could still put the Petitioner's son on the stand to testify about the Petitioner's work ethic and responsibilities as a father. The Petitioner, however, said that he didn't "want him up there." The Petitioner also refused to take the stand on his own behalf to present mitigating proof. Left with little mitigating proof to present, Counsel testified that he used the testimony of the victim's mother, who stated that she forgave the Petitioner. Counsel worked with the facts and testimony at his disposal in attempting to persuade the jury to give the Petitioner a life sentence with parole. Further, the Defendant did not call additional witnesses at the post-conviction hearing to establish mitigation. The evidence in the record does not preponderate against the post-conviction court's finding that the Petitioner failed to show by clear and convincing evidence that he was deprived of his

10

constitutional right to effective assistance of counsel. As a result, the post-conviction court correctly found that "[i]n light of the State's 'overwhelming evidence' . . . , Petitioner fail[ed] to meet his burden of demonstrating how mitigating factors had a reasonable probability of changing the outcome of the trial or prejudiced the judicial process."

Accordingly, we conclude that the Petitioner failed to show that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Having failed to show the first prong of the *Strickland* standard, the Petitioner has not met his burden of showing that he is entitled to post-conviction relief based upon Counsel's performance. *Id.* He is not entitled to relief as to this issue.

## B. Exculpatory Evidence

The Petitioner contends that the State failed to disclose an ex parte order of protection obtained by the victim that was later dismissed and police reports of domestic violence complaints that were later dropped. The State argues that the post-conviction court correctly denied the petition because the Petitioner did not prove that the State withheld this information or that Counsel did not receive it. We agree with the State.

In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Johnson*, 38 S.W.3d at 56 (quoting *Strickler v. Green*, 527 U.S. 263 (1999)).

Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (citing *Johnson*, 38 S.W.3d at 56).

The State does not have an obligation to disclose information that is not in the possession or control of the State. *Id*. (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)). A defendant must prove the following four prerequisites in order to establish a violation of due process under Brady:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove a due process violation by a preponderance of the evidence. *Id*. (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

The Tennessee Supreme Court defined "material" within the context of Brady: Evidence is deemed to be material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." . . . [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted). Our Supreme Court provided the following guidance for the review of *Brady* claims in the post-conviction context: "The "materiality" aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, *a defendant must show that there is a reasonable probability that the result of the proceedings would have been different*." *Cauthern v. State*, 145 S.W.3d at 571, 598-99 (Tenn. Crim. App. 2004) (emphasis added) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In the case under submission, the post-conviction court made the following findings on this issue:

Prosecutorial suppression of requested evidence both favorable to an

accused and material to either guilt or punishment violates due process. Brady v. Maryland, 373 U.S. 83, 87 (1963). Petitioner fails to show a due process violation because he fails to present evidence based in law or fact to establish the evidence is question was favorable to his case. Evidence of several domestic violence complaints filed against the Petitioner, even if the complaints were later dropped, tends to look incriminating, not exculpating. Further, the excluded evidence does not point to the mens rea of the Petitioner for purposes of determining whether he had the requisite intent for first degree murder; instead, the excluded evidence suggests the mens rea of the victim by showing several instances [that] the victim felt threatened by the Petitioner. Petitioner has failed to present evidence that the excluded evidence was both favorable and material to his guilt or punishment. Therefore, this issue is without merit.

After reviewing the record, we conclude that the Petitioner has not proven that the State withheld information or that the Petitioner's trial counsel did not receive information regarding the ex parte order of protection or police reports of domestic violence complaints. He is, therefore, not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE